UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON

STATE OF WEST VIRGINIA ex.rel.
DARRELL V. McGRAW, JR.,
Attorney General,

            Plaintiffs,

v.                                    Civil Action No. 2:09-1000

CVS PHARMACY, INC., a
Rhode Island Corporation,
KMART HOLDING CORPORATION,
a Delaware Corporation,
THE KROGER CO., an Ohio
Corporation, WAL-MART STORES,
INC., a Delaware Corporation,
WALGREEN CO., an Illinois
Corporation, and TARGET STORES,
INC., a Minnesota Corporation,

            Defendants.

MEMORANDUM OPINION AND ORDER

        Pending is the Attorney General's motion to remand,

filed October 13, 2009.

I.

        West Virginia law requires pharmacists to "substitute a

less expensive equivalent generic name drug" for prescriptions

for a brand name drug unless the generic drug is unsuitable for

the particular patient. W. Va. Code § 30-5-12b(b). Further, West Virginia law requires that "[a]ll savings in the retail price of the [generic] prescription . . . be passed on to the purchaser," and that "in no event shall such savings be less than the difference in acquisition cost of the brand name product prescribed and the acquisition cost of the substituted product." Id. at § 30-5-12b(g).

On August 24, 2009, the Attorney General instituted this action in the Circuit Court of Boone County, alleging that defendants "routinely violate this law and do not pass on generic-drug cost-savings to purchasers as the statute requires." (Compl. ¶ 20). The Attorney General's complaint contains three counts, discussed more fully infra: 1) violation of West Virginia's generic-drug pricing law, W. Va. Code § 30-5-12b(g); 2) violations of the West Virginia Consumer Credit and Protection Act ("WVCCPA"); and 3) impermissible collection of excess charges under West Virginia Code § 46A-7-111. (Id. at ¶¶ 23-35). The Attorney General seeks injunctive relief, civil penalties, "disgorgement of monies obtained as a result of the generic-drug overcharges," and other appropriate relief. (Id. at ¶ 1).

Defendants removed on September 10, 2009, asserting three grounds: 1) preemption under the Federal Employees Health

2

Benefits Act  ("FEHBA"), 5 U.S.C. § 8902(a) et seq.; 2)

preemption and "arising under" jurisdiction based upon the

Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §

1132 et seq.; and 3) the Class Action Fairness Act ("CAFA"), 28

U.S.C. §§ 1332(d), 1453.  On October 13, 2009, the Attorney

General moved to remand.


II.


A.   Governing Standard


     "Federal courts are courts of limited jurisdiction.

They possess only that power authorized by Constitution and

statute, which is not to be expanded by judicial decree."

Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377

(1994).  Title 28 U.S.C. § 1441(a) governs federal removal

jurisdiction and provides as follows:

> [a]ny civil action brought in a State court of which
> the district courts of the United States have original
> jurisdiction, may be removed by the . . . defendants .
> . . to the district court of the United States for the
> district and division embracing the place where such
> action is pending. . . .

28 U.S.C. § 1441(a).

     The burden of establishing removal falls upon the

removing party.  Mulcahey v. Colum. Organic Chem. Co., 29 F.3d

148, 151 (4th Cir. 1994).  Our court of appeals has observed time
and again that it is obliged to construe removal jurisdiction
strictly:

> We have noted our obligation "to construe removal
> jurisdiction strictly because of the 'significant
> federalism concerns' implicated" by it.  Maryland
> Stadium Auth. v. Ellerbe Becket Inc., 407 F.3d 255, 260
> (4th Cir. 2005) (quoting Mulcahey, 29 F.3d at 151). . .
> . Consistent with these principles, we have recognized
> that state law complaints usually must stay in state
> court when they assert what appear to be state law
> claims.  See, e.g., Harless v. CSX Hotels, Inc., 389
> F.3d 444, 450 (4th Cir. 2004); King, 337 F.3d at 424;
> Darcangelo v. Verizon Communications, Inc., 292 F.3d
> 181, 186 (4th Cir. 2002); Cook v. Georgetown Steel
> Corp., 770 F.2d 1272, 1274 (4th Cir. 1985).

Lontz v. Tharp, 413 F.3d 435, 440 (4th Cir. 2005).  "Any doubts
concerning the propriety of removal must be resolved in favor of
retained state court jurisdiction."  Marshall v. Manville Sales,
Corp., 6 F.3d 229, 232 (4th Cir. 1993).

        One source of federal jurisdiction is 28 U.S.C. § 1331,
which provides "[t]he district courts shall have original
jurisdiction of all civil actions arising under the Constitution,
laws, or treaties of the United States."  Removal is thus
appropriate if the face of the complaint raises a federal
question.  Lontz, 413 F.3d at 439; Pinney v. Nokia, Inc., 402
F.3d 430, 442 (4th Cir. 2005) (noting the well-pleaded complaint
rule, namely, "that a plaintiff is the master of the claim, and

4

he may avoid federal jurisdiction by exclusive reliance on state law in drafting his complaint.") (internal quotation marks omitted).

Respecting ERISA and FEHBA, defendants rely for removal upon two exceptions to the well-pleaded complaint rule.  First, defendants assert that FEHBA and ERISA completely preempt the Attorney General's claims.  Second, defendants claim that, even if the Attorney General's claims are not completely preempted by ERISA, the Grable doctrine justifies removal because the Attorney General's complaint poses a "necessary and substantial" federal issue, a variant of arising under jurisdiction.

B.   The Complete Preemption Doctrine

Under the doctrine of complete preemption, removal is appropriate if "the subject matter of a putative state law claim has been totally subsumed by federal law -- such that state law cannot even treat on the subject matter." Lontz, 413 F.3d at 439-40.  When complete preemption exists, federal law provides the exclusive cause of action, and in essence "there is . . . no such thing as a state-law claim." Id. at 440 (quoting Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 11 (2003)).  "The doctrine of

5

complete preemption thus prevents plaintiffs from 'defeat[ing] removal by omitting to plead necessary federal questions.'"  Id. (quoting Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 22 (1983)).  To prove complete preemption, "a defendant must establish that the plaintiff has a 'discernible federal [claim]' and that 'Congress intended [the federal claim] to be the exclusive remedy for the alleged wrong.'"  Pinney, 402 F.3d at 449 (citing King, 337 F.3d at 425).

C.    Federal Employee Health Benefits Act

While the sweep of this action is by no means limited to federal employees, it is noted that FEHBA, 5 U.S.C. § 8901 et seq., does create a comprehensive program of health insurance for federal employees.  Empire Healthchoice Assurance, Inc. v. McVeigh, 547 U.S. 677, 682 (2006).  In section 8902, Congress authorized the Office of Personnel Management ("OPM") to contract with insurance carriers to offer a variety of plans to federal employees.  Also in section 8902, Congress included a preemption clause, which states:

> The terms of any contract under this chapter which
> relate to the nature, provision, or extent of coverage
> or benefits (including payments with respect to
> benefits) shall supersede and preempt any State or
> local law, or any regulation issued thereunder, which

6

relates to health insurance or plans.
5 U.S.C. § 8902(m)(1).  "Thus, under § 8902(m)(1) as it now
reads, state law -- whether consistent or inconsistent with
federal plan provisions -- is displaced on matters of "coverage
or benefits."  Empire Healthchoice, 547 U.S. at 686.

In Empire Healthchoice, the Supreme Court applied
FEHBA's preemption provision to state-law claims made by a FEHBA
insurance provider seeking reimbursement for insurance benefits
that the enrollee recovered in a state-court tort action.  Id. at
697-98.  Weighing the provider's argument that FEHBA's preemption
provision independently conferred federal subject matter
jurisdiction, the court concluded that section 8902(m)(1) "does
not purport to render inoperative any and all state laws that in
some way bear on federal employee-benefit plans."  Id. at 697-98
(emphasis in original).  FEHBA's preemption provision and its
accompanying regulations, 5 CFR § 890.107(c), ensure that suits
brought by beneficiaries for denial of benefits will land in
federal court.  Id. at 696.  "Had Congress found it necessary or
proper to extend federal jurisdiction further, in particular, to
encompass contract-derived reimbursement claims between carriers
and insured workers, it would have been easy for Congress to say
so."  Id.

Inasmuch as the parties failed to establish that FEHBA left "no room for any state law potentially bearing on federal employee-benefit plans in general, or carrier-reimbursement claims in particular," the court found that complete preemption did not apply. Id. FEHBA's preemption clause is unusual inasmuch as section 8902(m)(1) provides that the terms of the FEHBA insurance plans shall preempt state law rather than giving the language of FEHBA itself preemptive effect. Id. Based on the unique nature of the clause, the court determined that a "modest reading of the provision is in order." Id.

Nevertheless, defendants contend that the Attorney General's claims impermissibly relate to how benefits were provided to FEHBA plan participants and, thus, are completely preempted by section 8902(m)(1) which provides the exclusive remedy for disputes relating to benefits. (Resp. 9). In support of this contention, defendants rely on Botsford v. Blue Cross and Blue Shield of Montana, Inc., 314 F.3d 390 (9th Cir. 2002). The court in Botsford held that FEHBA completely preempted the state-law claims of Botsford, a federal employee who sued the insurance carrier seeking full reimbursement for the cost of a medical procedure. Id. at 399. Botsford asserted that the carrier failed to pay him the amount he was entitled to under the FEHBA plan and asserted state-law claims of breach of contract and

8

violation of Montana's unfair trade practices law.  Id. at 395.
Although Botsford, a FEHBA plan enrollee, framed his claims
against a FEHBA plan provider under state law, the court
determined that his claims simplified into a "dispute over
benefits -- precisely the kind of dispute FEHBA preempts."  Id.

Whereas Botsford exemplifies the proper application of
section 8902(m)(1) to benefit disputes disguised as state-law
claims, the resolution of the Attorney General's claims in this
instance does not necessitate interpretation of a FEHBA plan or
its terms.  Employing a modest reading of section 8902(m)(1) as
articulated in Empire Healthchoice, the court concludes that
section 8902(m)(1) does not provide federal jurisdiction over the
Attorney General's action.  The defendants have not established
that the Attorney General's claims impermissibly relate to
coverage or benefits as established by the terms of a FEHBA
contract.  The Attorney General's claims are based solely on the
generic-drug pricing law and violations of the WVCCPA.  The
Attorney General does not contest the terms of a FEHBA insurance
plan nor do plaintiff's claims relate to denial of benefits under
a FEHBA insurance plan.  Under section 8902(m)(1), the terms of
FEHBA plans have preemptive effect, but there is not a FEHBA plan
at issue in this case to preempt the Attorney General's claims.

Defendants nevertheless suggest that the Attorney General's claims are preempted inasmuch as they will undermine the OPM's efforts to uniformly interpret FEHBA and its insurance contracts.  More specifically, they contend that the Attorney General's claims would create a patch-work of state regulations overlaying federal FEHBA contracts and increase the cost of implementing the FEHBA program.  (Defs.' Resp. at 8 (citing Botsford, 314 F.3d at 397-98)).  However, they have not established what, if any, effect the Attorney General's claims would actually have on the terms of FEHBA plans.  (Resp. 8).  As expressly stated in Empire Healthchoice, section 8902(m)(1) does not preempt all state laws that in some way bear on federal employee-benefit plans.  FEHBA's preemption provision is limited to those state-law claims that implicate the terms of a FEHBA plan.  Inasmuch as the Attorney General's claims do not implicate the coverage or benefits specified under a FEHBA plan, FEHBA does not provide federal subject matter jurisdiction in this case.

D.   Employee Retirement Income Security Act

Only those state law claims that are completely preempted by ERISA's civil enforcement provision, section 502(a), are properly removable to federal court.  Id. (citing 29 U.S.C. §

1132).   In Sonoco Products, our court of appeals articulated

three essential elements required for complete preemption under

ERISA:

> (1) the plaintiff must have standing under § 502(a) to
> pursue its claim; (2) its claim must "fall within the
> scope of an ERISA provision that it can enforce via §
> 502(a)"; and (3) the claim must not be capable of
> resolution "without an interpretation of the contract
> governed by federal law," i.e. an ERISA-governed
> employee benefit plan.

Sonoco Prods. Co., 338 F.3d at 372 (quoting Jass v. Prudential

Health Care Plan, Inc., 88 F.3d 1482, 1487 (7th Cir.

1996)(internal quotation marks and brackets omitted)).


Respecting the standing element, ERISA allows states to

bring civil suit in only two instances: 1) "to enforce compliance

with a qualified medical child support order," and 2) to "acquire

the rights of third parties through assignment for the limited

purpose of recouping payments made under state plans for medical

assistance."   Connecticut v. Physicians Health Servs. of Conn.,

Inc., 287 F.3d 110, 121 (2d Cir. 2002) (citing 29 U.S.C. §§ 1134,

1169(c)).


Inasmuch as this action is not one of the two types of

actions that states may pursue under ERISA, the Attorney General

does not have statutory standing to pursue its claims under

section 502.   Physicians Health, 287 F.3d at 120-21 (reading

11

section 502 as strictly limiting "the universe of plaintiffs who may bring certain civil actions," and concluding that Connecticut did not have standing under ERISA). As a result, the Attorney General's claims are not completely preempted and there is no federal jurisdiction on the basis of ERISA preemption.

E.    <u>Grable</u> Analysis

          Alternatively, defendants contend that the Attorney General's claims are subject to federal jurisdiction under ERISA through the arising under jurisdiction discussion in <u>Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.</u>, 545 U.S. 308 (2005). In <u>Grable</u>, the Supreme Court considered "another longstanding, if less frequently encountered, variety of federal 'arising under' jurisdiction, . . . having recognized for nearly 100 years that in certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues." <u>Id.</u> at 312. The Court in <u>Grable</u> established the test for determining whether a "substantial question of federal law" sufficient to warrant removal exists:

> The question is, does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities.

12

Id. at 314.  In doing so, the Court emphasized that merely alleging a "federal issue" does not operate "as a password opening federal courts to any state action embracing a point of federal law." Id.  Few cases can be "squeezed into the slim category Grable exemplifies."  Empire Healthchoice Assurance, Inc. v. McVeigh, 547 U.S. 677, 704 (2006); see also Wright & Miller, Federal Prac. And Proc. § 3562 ("Obviously, not every state-law claim raising a federal issue can invoke federal question jurisdiction.  Indeed, such cases will be exceptional.")

Despite the limited application of Grable, defendants contend that the "inevitable clash between the Attorney General's Complaint and the mandates of ERISA independently justify removal."  (Defs. Not. of Removal at 3).  In order to establish this rare type of "arising under" federal jurisdiction, defendants must demonstrate that each of the three prongs of the Grable test are met: 1) the case necessarily raises a federal issue; 2) the federal issue is substantial and in actual dispute; and 3) the exercise of federal jurisdiction will not disturb any congressionally approved balance of federal and state judicial responsibilities.  Grable, 545 U.S. at 314.

In defendants' notice of removal, they broadly assert that ERISA exclusively governs issues as to pricing, cost, terms and administration of the benefits under ERISA plans.  (Defs.'

Not. of Removal at 4).  While this may be true, ERISA plans are
not at issue in the Attorney General's claims.  In their response
to the Attorney General's motion to remand, defendants contend
that the Attorney General's claims involve a substantial and
actually disputed federal issue in that the court must determine
whether generic-drug purchasers are considered "consumers" under
the WVCCPA and ERISA.  (Defs.' Resp. at 17).

> To determine if the [WVCCPA] even applies or whether
> the Attorney General has any authority to assert claims
> on behalf of the actual "purchasers" of generic drugs
> in West Virginia -- those who pay for such prescribed
> drugs -- one must look to the scheme created and
> governed by ERISA, including its implementing
> regulations, as well as to the terms and provisions of
> the ERISA plans under which the participants and
> beneficiaries received benefits.

(Id.).  Inasmuch as the court must determine the application of
"consumer" with relation to the ERISA scheme, defendants assert
that it poses a substantial and disputed federal question that
must be resolved in federal court.  (Id.).

        The court is not persuaded that there is an "actually
disputed and substantial" federal issue embedded within the
Attorney General's state-law claims as required for federal
question jurisdiction under Grable.  As discussed above, ERISA
includes a complete preemption provision which provides federal
jurisdiction for those claims that ERISA governs exclusively.

The court is reluctant to squeeze the Attorney General's claims into the slim category of cases <u>Grable</u> exemplifies when the Attorney General's claims do not fall within the grant of federal jurisdiction provided by Congress within the statute itself. Furthermore, as the Attorney General aptly notes, his "claims will stand or fall on whether defendants dispense generic drugs in accordance with West Virginia's generic-drug pricing law." (Pl.'s Reply at 26).

Defendants suggest that the definition of a "consumer" under the WVCCPA may require some interpretation of the term related to ERISA. This tenuous connection with a federal statute is simply not sufficient to establish a substantial and actually disputed question of federal law. As such, the Attorney General's "ability to prevail on its claims in no way depends on any showing of a violation of federal law or resolution of a disputed federal issue, as <u>Grable</u> requires." (<u>Id.</u>).

Inasmuch as defendants have failed to establish a "substantial and actually disputed" federal issue embedded within the Attorney General's state-law claims, the court declines to find federal question jurisdiction under <u>Grable</u>.

**F.    Class Action Fairness Act**


In order to ascertain if removal jurisdiction exists under CAFA, the analysis proceeds in four steps.  First, the court sets forth in detail the relevant allegations of the First Amended Complaint and the Notice of Removal.  Second, the court undertakes a general discussion of CAFA's requirements.  Third, the court discusses the text and structure of the WVCCPA, particularly with respect to the alleged statutory basis supporting removal, namely, the Count Three claim alleging a violation of section 46A-7-111.  Finally, the court will examine the contours of the <u>parens</u> <u>patriae</u> doctrine generally and in this circuit, particularly with reference to consumer protection actions, in order to ascertain if the Attorney General is proceeding in a <u>parens</u> <u>patriae</u> capacity or, instead, whether he is pursuing a class action by another name.


**1.  The First Amended Complaint and the Notice of Removal**


In the "Summary of Case" section of the First Amended Complaint, the Attorney General alleges as follows:

> West Virginia law requires substitution of generic drugs, when appropriate, and further requires that pharmacies pass on the entire amount of the savings realized from the use of generic drugs to purchasers of generic drugs.  The Defendants, however, <u>routinely</u>

<u>violate this law</u>, and instead see the reduced acquisition cost of generic drugs <u>as an opportunity to generate higher profit-margins</u> from the sale of generics.  Pursuant to West Virginia Code §§ 30-5-23 and 46A-7-108, the State seeks to enjoin the Defendants <u>from violating the statute</u>.  Additionally, because each violation of the generic-drug pricing law constitutes unfair or deceptive acts or practices in trade or commerce, the State <u>also seeks a civil penalty</u> for each violation, <u>as well as disgorgement of monies obtained as a result of the generic-drug overcharges</u>, and other appropriate relief.

(First Am. Compl. ¶ 1).

The Attorney General reiterates the nature of the lawsuit later in his complaint, noting again that the defendants "routinely violate" the generic-drug pricing law, "see[ing] the lower acquisition cost of generic drugs as an opportunity to increase their profits."  (<u>Id.</u> ¶ 20).  The First Amended Complaint also includes excerpts from certain defendants' annual reports detailing the greater profits experienced on generic, as opposed to brand-name, drugs.  (<u>Id.</u> ¶¶ 26-29).  It is this framing of the Attorney General's claim that drives the analysis respecting whether CAFA supports removal.

Count One alleges a violation of the generic-drug pricing law.  Count Two seeks relief under the WVCCPA, asserting that each violation of the generic-drug pricing statute constitutes an unfair or deceptive act or practice under West Virginia Code § 46A-6-104.  Count Three, upon which CAFA removal

17

is based, consists of two single-sentence allegations as follows, one of which is of an incorporative nature:

> 43. The State incorporates by reference as if fully set forth herein each and every allegation in the proceeding paragraphs of this Complaint.
>
> 44. By their violations of the generic-drug pricing statute as described above, the Defendants have collected excess charges under West Virginia Code § 46A-7-111(l).

(Id. ¶¶ 43-44).[1]

In their notice of removal, defendants assert that "the Complaint is a disguised class action, supporting removal under" CAFA.  (Not. of Remov. ¶ 1; see also id. ¶ 7 (noting "the Complaint is a disguised class action . . . .").  Paragraphs 28 and 29 further elucidate defendants' basis for removal:

> Among the CCPA provisions invoked by the Attorney General is § 46A-7-l11, which allows him to recover excess charges from creditors for the benefit of State consumers, a relief akin to that sought in class actions.  The Attorney General claims that there are up to 32 million prescriptions possibly issue[d] for 2008 alone, which amounts to 17.7 prescriptions per capita. (Compi., ¶ 13)[.]  The Attorney General essentially proposes to be a single and adequate representative of the purchasers of these prescriptions (excluding

_____

[1]As discussed more fully infra, section 46A-7-111(1) explicitly authorizes the Attorney General, "[a]fter demand," to "bring a civil action against a creditor for making or collecting charges in excess of those permitted by this chapter."  W. Va. Code § 46A-7-111(1).  In their motion to dismiss, defendants assert that the Attorney General made no presuit demand as required by the statute.  Defendants also launch a frontal assault on the Attorney General's allegation that they qualify as "creditor[s]" under section 46A-7-111.

> Medicaid and Medicare claims). These facts make it
> clear that the Complaint is a class action that belongs
> in federal court. <u>State ex rel Caldwell v. Allstate
> Ins. Co.</u>, 536 F.3d 418 (5th Cir. 2008).
>
> Here, the statutory CAFA requirements also have
> all been met: (a) the parties are at least minimally
> diverse (indeed, the West Virginia resident purchasers
> have a different citizenship from all of the
> Defendants); (b) the aggregate amount in controversy
> exceeds $5 million; and (c) all other CAFA and removal
> requirements have been satisfied.

(<u>Id.</u> ¶¶ 28-29 (footnotes omitted)). Paragraph 30 asserts that

the court "must 'disregard nominal or formal parties' and must

instead focus on the citizenship of the 'real parties' to the

controversy. (Not. of Remov. ¶ 30). Defendant further assert

that "[w]here (as here in Count III) the relief sought by an

attorney general inures principally to the benefit of private

individuals, it is those individuals (not the attorney general)

who are the real parties in interest." (<u>Id.</u>).


### 2. CAFA Generally


As aptly noted by defendants, CAFA represents a

Congressional extension of diversity-based subject matter

jurisdiction to class actions when there is minimal diversity and

the total amount in controversy exceeds $5,000,000, exclusive of

interests and costs. <u>Ferrell v. Express Check Advance of SC LLC</u>,

591 F.3d 698, 702 (4th Cir. 2010) (quoting 28 U.S.C. §

1332(d)(2)(A)); see also Palisades Collections LLC v. Shorts, 552
F.3d 327, 331 (4th Cir. 2008).  In order to satisfy the minimal
diversity requirement, any one member of the class of plaintiffs
must be a citizen of a state different from any defendant.  Id.

        CAFA subject matter jurisdiction does not apply solely
to traditional class actions.  CAFA grants federal jurisdiction
over "class actions" as well as "mass actions," both of which are
defined by the statute.  Under CAFA, a "class action" is "any
civil action filed under rule 23 of the Federal Rules of Civil
Procedure or similar State statute or rule of judicial procedure
authorizing an action to be brought by 1 or more representative
persons as a class action."  28 U.S.C. § 1332(d)(1)(B); see also
Palisade Collections, 552 F.3d. at 331.

        A "mass action" is "any civil action . . . in which
monetary relief claims of 100 or more persons are proposed to be
tried jointly on the ground that the plaintiffs' claims involve
common questions of law or fact, except that jurisdiction shall
exist only over those plaintiffs whose claims in a mass action
satisfy the jurisdiction amount requirement under [28 U.S.C. §
1332(a)]."  28 U.S.C. § 1332(d)(11)(b)(i); see also Louisana ex
rel. Caldwell v. Allstate Ins. Co., 536 F.3d 418, 423-24 (5th
Cir. 2008).  Despite having different statutory elements, a mass
action is deemed a removable class action under CAFA if it meets

the necessary statutory requirements.  28 U.S.C. § 1332(d)

(11)(A).  Both traditional class actions and mass actions require

that plaintiff bring suit as a representative of a class of

persons.  28 U.S.C. § 1332(d)(1)(B), (d)(11)(b)(i).


    3.  Text and Structure of the WVCCPA and Section 46A-7-111


        Section 46A-7-111, upon which CAFA removal is based,

provides in pertinent part as follows:

> (1) After demand, the attorney general may bring a
> civil action against a creditor for making or
> collecting charges in excess of those permitted by this
> chapter. If it is found that an excess charge has been
> made, the court shall order the respondent to refund to
> the consumer the amount of the excess charge.  If a
> creditor has made an excess charge in a deliberate
> violation of or in reckless disregard for this chapter,
> or if a creditor has refused to refund an excess charge
> within a reasonable time after demand by the consumer
> or the attorney general, the court may also order the
> respondent to pay to the consumer a civil penalty in an
> amount determined by the court not in excess of the
> greater of either the amount of the sales finance
> charge or loan finance charge or ten times the amount
> of the excess charge. Refunds and penalties to which
> the consumer is entitled pursuant to this subsection
> may be set off against the consumer's obligation. If a
> consumer brings an action against a creditor to recover
> an excess charge or civil penalty, an action by the
> attorney general to recover for the same excess charge
> shall be stayed while the consumer's action is pending
> and shall be dismissed if the consumer's action is
> dismissed with prejudice or results in a final judgment
> granting or denying the consumer's claim.

> (2) The attorney general may bring a civil action

> against a creditor or other person to recover a civil
> penalty for willfully violating this chapter, and if
> the court finds that the defendant has engaged in a
> course of repeated and willful violations of this
> chapter, it may assess a civil penalty of no more than
> five thousand dollars for each violation of this
> chapter.

W. Va. Code § 46A-7-111.  An appropriate analysis of section 46A-7-111 requires not only a textual examination of its terms but also reference to its context and its location within the WVCCPA.

It is noteworthy that section 46A-7-111 is found within the article of the WVCCPA entitled "ADMINISTRATION."  The article, consisting of 15 sections, creates the Division of Consumer Protection.  It also addresses, <u>inter alia</u>, such subjects as (1) consumer education, (2) conducting studies designed to effectuate the purposes and policies of the WVCCPA, (3) reporting to the Governor and the Legislature on a variety of subjects, including "consumer credit and . . . consumer protection problems in the state" and "a general statement of the activities of their offices and of others to promote the purposes of" the WVCCPA.  <u>See</u> W. Va. Code § 46A-7-102(1)(a), (c), and (4). The article also specifies the Attorney General's extensive investigatory powers (46A-7-104), which include subpoenaing witnesses and other materials and entering administrative cease and desist orders against those whom he deems to be engaging in

22

violations of the WVCCPA. The statute makes clear as well that the powers granted to the Attorney General do not affect the remedies available to consumers under the WVCCPA.

As noted, section 46A-7-111(1) in particular explicitly authorizes the Attorney General to "bring a civil action against a creditor for making or collecting charges in excess of those permitted by this chapter." W. Va. Code § 46A-7-111(1); State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc., 194 W. Va. 770, 778, 461 S.E.2d 516, 524 (1995) ("This statute clearly gives the Attorney General the power to act on behalf of a consumer when an 'excess charge' has been imposed."). If an "excess charge" is found to have been levied by a creditor against a consumer, subsection (1) first states, as noted in Runyan, that "the court shall order the respondent to refund to the consumer the amount of the excess charge." W. Va. Code § 46A-7-11; Runyan, 194 W. Va. at 775, 779, 461 S.E.2d at 521, 525) (reiterating multiple times that the monetary relief under the first remedy of section 46A-7-111(1) is characterized as a "refund").[2] There is a second

_____

[2]In a situation such as this, with potentially thousands of affected individuals, it is doubtless the case that not all affected consumers, presumably identifiable from defendants' records, will be located and refunded any excess charges. The statute does not specify the mechanism for receiving all of the refunds, thereby implementing a disgorgement remedy, and then distributing the monies collected. In the event of a proposed

(continued...)

remedy in subsection (1) as well, namely that a deliberate or reckless excess charge, or a refusal to refund within a reasonable time after demand, gives rise to a civil penalty for the consumer alone "in an amount . . . not in excess of the greater of either the amount of the sales finance charge or loan finance charge or ten times the amount of the excess charge."  W. Va. Code § 46A-7-11(1).

It is apparent, however, that the civil penalties sought by the Attorney General under section 46A-7-111 are not of the type provided in aid to the consumer under subsection (1). Instead, he seeks "[c]ivil penalties <u>of up to $5000</u> for each repeated and willful violation of Chapter 46A, under West Virginia Code § 46A-7-111," an amount mentioned only in section 46A-7-111(2).  (<u>See</u> First Am. Compl. at 12; Pl.'s Memo. in Supp. of Remand at 14 (stating "Without a doubt the State has a pecuniary interest in the civil penalties (up to $5,000 per

---

[2](...continued)
settlement, a claims administrator may be designated by the parties to receive in trust any amount of the settlement allocated to section 46A-7-111(1) violations awaiting requests for the money from affected consumers.  Those concerns are not material to the present inquiry.  <u>See</u> <u>Edmond</u>, 934 F.2d at 1313 ("Although the Division, under Maryland law, eventually may have to provide a procedure to notify and process individual consumers' desire for reimbursement, the failure to do so does not alter the Division's ability to ensure that the Act's provisions for restitution will not be eviscerated.").

violation) that may be assessed by state courts under West Virginia Code § 46A-7-111(2).").  The type of civil penalty sought by the Attorney General is found in subsection (2) rather than subsection (1).  The $5,000 subsection (2) civil penalty, unlike the penalty provision in subsection (1), makes no mention of the consumer receiving the penalty, leading one to conclude that the subsection (2) charge enures to the state alone.

Having considered the precise claims alleged by the Attorney General and their statutory origins and context, an analysis of the parens patriae doctrine, and its application here, is now in order.

### 4. Parens Patriae Law and Analysis

The Attorney General's complaint is framed as a parens patriae suit brought by the state through its chief law enforcement officer.  Traditionally, parens patriae refers to the role of the sovereign acting as the guardian of persons under legal disability.  Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez, 458 U.S. 592, 600 n. 8 (1982).  The common-law concept has evolved and no longer applies to states advocating solely for the interests of particular citizens who are unable to

25

represent themselves.  Id.  "In fact, if nothing more than this is involved -- i.e., if the State is only a nominal party without a real interest of its own -- then it will not have standing under the parens patriae doctrine."  Id. (citing Pennsylvania v. New Jersey, 426 U.S. 660 (1976); Oklahoma ex rel. Johnson v. Cook, 304 U.S. 387 (1938); Oklahoma v. Atchison, T & S.F.R. Co., 220 U.S. 277 (1911)).

In order to have standing in a modern parens patriae action, the state must bring suit seeking redress of an injury to one of its quasi-sovereign interests.  Id.  A quasi-sovereign interest "is a judicial construct that does not lend itself to a simple or exact definition."  Id.

Our court of appeals has summarized the limits of the doctrine.  As observed in the quotation below, the court of appeals noted specifically that parens patriae standing is appropriate in those instances where the interests of a distinct group of citizens are being advanced by a state, as long as the state is contemporaneously pursuing vindication of a separate and independent quasi-sovereign interest as well:

> [P]arens patriae is a standing doctrine under which a
> state may under proper circumstances sue on behalf of
> its citizens when a separate quasi-sovereign interest
> also is at stake. See Alfred L. Snapp & Son, Inc. v.
> Puerto Rico, 458 U.S. 592, 600-01, 102 S.Ct. 3260,

26

> 3265-66, 73 L.Ed.2d 995 (1982) (holding that Puerto
> Rico had <u>parens</u> <u>patriae</u> standing to seek redress from
> private parties for discriminating against its citizens
> in ways that impaired state's participation in federal
> employment programs).  The doctrine is a quite limited
> one; it does not confer standing upon a state simply to
> represent the interests of any of its citizens who, for
> whatever reason, cannot represent themselves; <u>there
> must be an independent state sovereign interest at
> stake</u>.

<u>United States v. Johnson</u>, 114 F.3d 476, 481-82 (4th Cir. 1997)[3];

<u>see</u> <u>also</u> <u>In re Edmond</u>, 934 F.2d 1304, 1310 (4th Cir. 1991) ("The

state must be more than a 'nominal party without a real interest

of its own'; it "must articulate an interest <u>apart from the</u>

<u>interests of</u> . . . <u>particular private parties</u> . . . .")

(emphasis supplied) (citations omitted).  At the same time, as

noted in <u>Hawaii v. Standard Oil Co.</u>, 405 U.S. 251, 257 (1972), a

court must guard against duplicative recoveries by a sovereign

and its citizens in a <u>parens</u> <u>patriae</u> setting.

      The Supreme Court in <u>Snapp</u> identified two sovereign

interests and two nonsovereign interests belonging to states.

---

[3]The decision in <u>Johnson</u> emphasized the point further,
noting as follows:

> No quasi-sovereign interest <u>separate and apart</u> from the
> dependent children's interests exists in the
> enforcement of state child support orders; if a state
> appeared as a party in such an enforcement action, its
> interest would only be a nominal one, not a 'real,'
> separate state interest.

<u>Id.</u> at 482 (emphasis supplied).

27

The states' sovereign interests include: 1) the states' interest in exercising power over individuals and entities within their jurisdiction by creating and enforcing legal codes; and 2) the states' demand for recognition from other sovereigns, which most frequently involves the maintenance and recognition of borders." Id. at 601.  In contrast to these two sovereign interests, states' nonsovereign interests include: 1) the states' involvement in a variety of proprietary interests through ownership of land or participation in a business venture which it may need to pursue in court, and 2) the states' interest in bringing suit on behalf of the interests of a private party solely for the sake of the real party in interest.  Id. at 601-02.  In this latter type of nonsovereign action, the state is not remedying injury against the state, and, thus, is simply a nominal party in the action.  Id.

Quasi-sovereign interests fall somewhere in between those interests identified as sovereign or nonsovereign.  In Snapp, the court provided a vague outline of the elements necessary for states to successfully articulate a parens patriae action based on the states' quasi-sovereign interests.  Snapp, 458 U.S. at 607.  In order to maintain such an action, the state must express an interest in the action beyond recovering on behalf of its citizens.  Id.  States have a quasi-sovereign

interest in the well-being of their citizens.  Id.; In re Edmond,
934 F.2d at 1310.

More specifically, states have a quasi-sovereign
interest in their citizens' health and well-being, both physical
and economic.  Snapp, 458 U.S. at 607; In re Edmond, 934 F.2d at
1310.  "Although more must be alleged than injury to an
identifiable group of individual residents, the indirect effects
of the injury must be considered as well in determining whether
the State has alleged injury to a sufficiently substantial
segment of its population."  Id.  One indication that the state
has standing to sue as parens patriae is whether the injury
alleged is one that the state would likely attempt to address
through its sovereign lawmaking powers.  Id.

At bottom, the Attorney General here is pursuing a
consumer protection action.  The decision in In re Edmond is thus
quite helpful inasmuch as it addressed the nature of parens
patriae litigation in light of an action instituted by the
Consumer Protection Division ("Division") of the Office of the
Attorney General of Maryland.  The Division sought a
nondischargeability order in the bankruptcy court relating to an
earlier administrative action by the Division against a debtor
under the Maryland Consumer Protection Act ("Act").  The

29

administrative action sought an injunction and restitution
against the debtor based upon his failure to fill contact lens
orders and provide requested refunds to consumers.  A hearing
officer found that the debtor had violated the Act.

        In seeking a nondischargeability order from the
bankruptcy court related to the relief awarded during the
administrative proceedings, the Division acted "'on behalf of
itself <u>and all consumers</u> listed in debtor's schedules. . . .'"
<u>Id.</u> at 1306 (emphasis added).  Debtor moved to dismiss on the
grounds that the Division failed to obtain class certification or
otherwise comply with Rule 23.[4]  The bankruptcy judge concluded
that class certification was unnecessary.  <u>Id.</u> (quoting
bankruptcy court's determination that "'[t]his was not a class
action but rather an action brought by the Attorney General as
<u>parens</u> <u>patriae</u>.").  The bankruptcy judge additionally concluded
that "the debts, including '<u>all consumer claims</u> arising after

_____

    [4]Debtor also challenged the Division's request for
restitution:

        [A]ccording to Edmond, the Division has not contacted,
        at any time over the past four years, the consumers who
        originally had lodged complaints and has no plan for
        ensuring that refunds reach those consumers.  Without
        class certification, according to Edmond, the Division
        lacked standing to bring and prosecute the action.

<u>In re Edmond</u>, 934 F.2d at 1309.

October 11, 1985' and other specific additional claims arising prior to that date, were nondischargeable." Id. (emphasis added).

It appears that the court of appeals found significant the fact that "[t]he Act confer[red] upon the Division an interest apart from that of any individual injured consumer" inasmuch as "[t]he Division 'acts as an arm of the Attorney General, entrusted with broad powers to enforce and interpret the Consumer Protection Act . . . and with a mandate to protect and promote the welfare of consumers.'" Id. at 1310 (quoting Consumer Protection Div. Office of Atty. Gen. v. Consumer Pub. Co., 304 Md. 731, 745, 501 A.2d 48, 55 (1985)). This alone appears to have satisfied the panel of the parens patriae nature of the action. In re Edmond, 934 F.2d at 1311 ("When proceeding under the Act, the Division serves a quasi-sovereign interest, the presence of which confers parens patriae standing.").

The court of appeals also noted that "[t]wo aspects of Maryland law make explicit that the Division acts on behalf of the state's quasi-sovereign interest when it pursues actions under the Act." Id. at 1310. The first aspect was that the Act contemplated enforcement by the Division irrespective of complaints from individual consumers. The second aspect was that

31

"Maryland law has construed the restitution provision of the Act [as] . . . embod[ying] the state's interest in disgorging the benefit from the violator."  Id. at 1310.

These same two features are found in Article 7 of the WVCCPA and section 46A-7-111 in particular.  First, section 46A-7-102(1)(a) provides that the Attorney General may "[r]eceive and act on complaints . . . or commence proceedings on his own initiative . . . ."  Id. (emphasis added); see also Manchin v. Browning, 170 W. Va. 779, 789, 296 S.E.2d 909, 919 (1982) (stating that "in the area . . . of consumer protection . . . litigation, the Attorney General is statutorily charged as an administrator of the law and appears in civil proceedings on his own motion as the agent and legal representative of the state and the citizens thereof.") (emphasis added).

To the extent any doubt remains respecting the Attorney General's ability to act apart from consumer complaints, section 46A-7-103(1) provides that "the attorney general may pursue any investigation, prosecute any suit and take any other proper action relating to the enforcement of any consumer protection provision in this chapter."  Id.  Additionally, as noted, the text of section 46A-7-111 authorizes an independent civil action by the Attorney General designed to result in civil penalties, recoverable in this instance for the state, and an order for

refunds of excess charges. Consequently, as in In re Edmond, the
Attorney General need not await a consumer complaint prior to
taking action under section 46A-7-111.

Second, the excess charge statute, like the law of
Maryland in In re Edmond, "embod[ies] the state's interest in
disgorging the benefit from the violator" separate and apart from
the interests of particular consumers in obtaining recompense.
Id. at 1310. One portion of section 46A-7-111(1) provides as
follows:

> If a consumer brings an action against a creditor to
> recover an excess charge or civil penalty, an action by
> the attorney general to recover for the same excess
> charge shall be stayed while the consumer's action is
> pending and shall be dismissed if the consumer's action
> is dismissed with prejudice or results in a final
> judgment granting or denying the consumer's claim.

W. Va. Code § 46A-7-111. In instances where the excess charge to
consumers is minimal on a per capita basis, it may be the case
that the consumer never discovers, or does not desire, to pursue
a recovery. It seems apparent, however, that at least one
purpose served by this provision is to assure that disgorgement
through the refund process occurs irrespective of whether
affected consumers were even aware of, or interested in, pursuing
a refund.

Additionally, the Attorney General's views respecting
his purpose behind seeking the refund are important according to

33

In re Edmond.  In assessing what constituted a quasi-sovereign interest there, the court of appeals gave weight to Maryland's assessment.  For example, the panel distinguished one case from another jurisdiction on the basis that "Maryland considers violations of the Act an injury contrary to its quasi-sovereign interest."  Id. at 1312.  It is apparent that the Attorney General here is of a similar notion.  (See, e.g., (Pl.'s Memo. in Supp. of Remand at 1-2 ("The State, as is its sovereign right, filed this lawsuit in state court to enforce its state laws against the defendants, who are routinely violating state law.")).

As made clear by both the summary of the First Amended Complaint and the memorandum in support of remand, the relief sought by the Attorney General is imbued with a "disgorgement" purpose.  A particular consumer on whose behalf the Attorney General might sue would simply desire recompense for the excess charges he incurred.  It is doubtless the case that a refund order by a state circuit judge would accomplish that goal as to all affected consumers in this action.  Separate and apart from that incidental compensatory purpose, however, the Attorney General's paramount goal is to extract from the alleged wrongdoers every penny associated with the excess charges, along

with civil penalties flowing to the state alone.[5]   This
overriding purpose is supported by his profit allegations in the
First Amended Complaint and, as noted, his use of the very word
disgorgement in both the operative pleading and his remand
briefing. (First Am. Compl. at 2, 12; Pl.'s Memo. in Supp. at 2;
Pl.'s Reply at 3).

        The disgorgement remedy, if achieved, serves as a
warning to future violators that they will not long profit from
consumer fraud.  As in In re Edmond, section 46A-7-111(1) also
does not require the Attorney General to make any showing of
reliance by, or harm to, any individual consumers prior to a
refund being ordered.  He need only demonstrate an excess charge
was levied.

        By use of the disgorgement remedy, the Attorney General
also accomplishes the manifest public protection purposes of the
WVCCPA, both presently and going forward, that were intended by

_____

        [5]The Attorney General's separate, quasi-sovereign interest
under section 46A-7-111 is emphasized as well by the civil
penalty provision he has chosen to pursue here.  Had he simply
desired to make whole the affected consumers, he would have
sought not only the refunds but also the seemingly generous
consumer-based civil penalties found in subsection (1).  As
noted, the consumer civil penalty can amount to as much as ten
times the amount of the excess charge.  Instead, as noted, he
chose to recover only the civil penalties available to the
sovereign under subsection (2).

the Legislature and identified explicitly, and repeatedly, by the supreme court of appeals.  See, e.g., State ex rel. McGraw v. Telecheck Services, Inc., 213 W. Va. 438, 448, 582 S.E.2d 885, 895 (2003) ("'The purpose of the [WV]CCPA is to protect consumers from unfair, illegal, and deceptive acts or practices by providing an avenue of relief for consumers who would otherwise have difficulty proving their case under a more traditional cause of action.'") (alteration in original) (quoting Runyon, 194 W. Va. at 777, 461 S.E.2d at 523).  This public-protection goal applies not only to the WVCCPA as a whole, but section 46A-7-111 in particular:

> Logic and experience dictate that if the types of lawsuits which the Attorney General could bring under the CCPA did not include lawsuits against financial institutions such as the defendants, these institutions could, if unsavory, run in effect a "laundry" for "fly-by-night" retailers that seek to excessively charge their customers.  Consequently, the real meaning of consumer protection would be stripped of its efficacy.

Runyan, 194 W. Va. at 780, 461 S.E.2d at 526 (construing section 46A-7-111).

In enacting section 46A-7-111, the Legislature conferred upon the Attorney General a freestanding consumer-protection duty, thereby advancing a quasi-sovereign interest.  Additionally, he is entrusted with broad powers to implement the WVCCPA and protect and promote consumer welfare in the process.

36

Inasmuch further as the Attorney General has articulated an "interest apart from the interests of . . . particular private parties," In re Edmond, 934 F.2d at 1310, he is properly considered to be the real party in interest here.

It is thus apparent that Count Three is appropriately pursued in a parens patriae capacity.  In re Edmond, 934 F.2d at 1313 ("The Division acted, not as a class representative, but on behalf of the state's quasi-sovereign interest in ensuring consumer protection.  Throughout the proceedings, the Division has represented only itself.  There being no class, class certification and other aspects of Rule 23, therefore, would have been inappropriate."); see also Jack Ratliff, Parens Patriae: An Overview, 74 Tul. L. Rev. 1847, 1857 (2000) (noting that "[t]he outlines of parens patriae authority are too vague to permit any predictability" but that "[a] state has a sufficient interest in protecting its citizens from . . . consumer scams.  That much we know.").

While it is unnecessary to mine the legislative history to reach the foregoing result, excerpts from the CAFA floor debate are interesting.  One portion of the debate dealt with an amendment, ultimately rejected, that would have explicitly exempted from CAFA's reach any class actions filed by state

37

attorneys general.  Senator Orrin Hatch, then serving as the

Chairman of the Committee on the Judiciary, observed as follows:

> Let me first note that this amendment, which
> excludes from the scope of this legislation any "civil
> action brought by or on behalf of, the Attorney General
> of any State," is unnecessary. Let me explain why.

> State attorneys general have authority . . . to
> bring enforcement actions to protect their citizens.
> These suits, known commonly as <u>parens</u> <u>patriae</u> cases,
> are similar to class actions to the extent that the
> attorney general represents a large group of people.

> <u>But let me be perfectly clear that they are not</u>
> <u>class actions</u>.  There is no certification process,
> there are no representative class members named in the
> complaint, and plaintiffs' attorneys who stand to gain
> millions of dollars in fees.  Rather, they are unique
> lawsuits authorized under State constitutions or State
> statutes that are brought on behalf of the citizenry of
> a particular State.  <u>These actions are brought</u>
> <u>typically in consumer protection matters under State</u>
> <u>law and usually involve local disputes. As such, S. 5</u>
> <u>in no way affects these lawsuits</u>.

> . . . .

> Th[e] statutory definition [of the term "class
> action"] makes it perfectly clear that the bill applies
> only to class actions, and not <u>parens</u> <u>patriae</u> actions.
> Class actions being those lawsuits filed in Federal
> district court under rule 23 of the Federal rules of
> civil procedure or lawsuits brought in State court as a
> class action. Neither of these conditions are met when
> compared to the nature of a <u>parens</u> <u>patriae</u> action, and
> consequently, are excluded from the reach of this bill.

151 Cong. Rec. S1157-02, 1163-64 (daily ed. Feb. 9, 2005)

(emphasis added) (statement of Judiciary Committee Chairman Orrin

38

Hatch). The Senate sponsor of CAFA, Senator Charles Grassley, was of precisely the same view. Id. at 1163.[6]

Defendants nevertheless rely upon a decision by the United States Court of Appeals for the Fifth Circuit, Louisana ex rel. Caldwell v. Allstate Ins. Co., 536 F.3d 418, 423 (5th Cir. 2008). In Caldwell, Louisiana's attorney general filed suit in state court against various insurance and advertising companies for violations of Louisiana's antitrust laws. The state alleged that defendants engaged in improper price-fixing in the calculation of amounts to be paid under proper insurance policies for repair services. Seeking to "redress the wrongs committed by [the] defendants against [Louisiana] and its citizens," the attorney general filed a putative parens patriae action seeking forfeiture of illegal profits, statutory treble damages, and injunctive relief. Id. at 422-23.

_____

[6]The parens patriae nature of this action aside, there are additional barriers to CAFA jurisdiction. Whether viewed as a "class action" or as a "mass action" defendants have not demonstrated that at least one alleged consumer member of any putative class satisfies the CAFA amount-in-controversy requirement. See Cappuccitti v. DirecTV, Inc., 611 F.3d 1252, 1256 (11th Cir. 2010)("We hold that in a CAFA action originally filed in federal court, at least one of the plaintiffs must allege an amount in controversy that satisfies the current congressional requirement for diversity jurisdiction provided in 28 U.S.C. § 1332(a)."); Abrego Abrego v. Dow Chem. Co., 443 F.3d 676, 689 (9th Cir. 2006).

The defendants in <u>Caldwell</u> removed the action on the grounds that the case was in substance a "class action" or a "mass action" as defined by CAFA.  <u>Id.</u> at 423.  The issue in <u>Caldwell</u>, as here, was whether the attorney general was pursuing a <u>parens</u> <u>patriae</u> action or, instead, a class action in which the citizen policyholders were the real parties in interest.[7]

The panel majority in <u>Caldwell</u> appears to have been influenced substantially by the fact that antitrust claims were presented.  After noting the Supreme Court's view that class actions rather than <u>parens</u> <u>patriae</u> actions "are the preferred vehicle for addressing antitrust violations," the panel majority observed that "it is clear that . . . there are some limitations

---

[7]The decision in <u>Caldwell</u> is the only decision at the federal appellate level to consider <u>parens</u> <u>patriae</u> standing in light of CAFA.  On July 29, 2010, the United States Court of Appeals for the Tenth Circuit granted leave to appeal in a similar case.  In <u>BP America, Inc. v. Oklahoma ex rel. Edmondson</u>, --- F.3d ---, 2010 WL 2961253 (10th Cir. Jul. 29, 2010), the Attorney General of Oklahoma sued BP America, Inc., in Oklahoma state court.  He alleged manipulations of propane gas prices in violation of the Oklahoma Consumer Protection Act, asserting that Oklahoma consumers were forced to pay higher propane prices than would otherwise have been the case with lawful pricing.  According to the attorney general, he pursued the action in a <u>parens</u> <u>patriae</u> capacity.  As here, he sought restitution, civil penalties, and injunctive relief.  BP removed, asserting the case was a "mass action" under CAFA.  The district court disagreed and remanded the case.  In granting leave to appeal, the Tenth Circuit court of appeals noted that "the district court's decision indisputably charted novel waters in this circuit on what appear to be eminently debatable legal questions."  <u>Id.</u> at *5.

[on parens patriae actions], particularly when a state is seeking to recover damages for alleged injuries to its economy." Id. at 427. In this action, however, no antitrust claims are pled. Instead, the Attorney General seeks to recover for consumer protection violations, which our court of appeals in In re Edmond permits him to do in a parens patriae capacity.

Additionally, the decision in Caldwell concluded that the statute under which the attorney general sought treble damages plainly contemplated individual enforcement. That conclusion is understandable in light of the entirety of that statute: "Any person who is injured in his business or property by any person by reason of any act or thing forbidden by this Part may sue in any court of competent jurisdiction and shall recover threefold the damages sustained by him, the cost of suit, and a reasonable attorney's fee." La. Rev. Stat. Ann. § 51:137. This statute bears little resemblance to section 46A-7-111, which explicitly authorizes the Attorney General to pursue those who levy excess charges. As noted earlier, the disgorgement remedy sought here inures not only to the benefit of the consumer but also to the state, denying the wrongdoer of the profit resultant from its misconduct and thereby discouraging repeat offenses and like-minded entities from engaging in similar activities in the future.[8]

_____

[8]In concluding that the treble damage remedy was designed
(continued...)

Further, the majority opinion, relying upon a Senate report, explicitly stated that its understanding of the central definition in CAFA, namely "class action," should be construed "broadly" and with a "'liberal[]'" bent.  Id. at 424.  That view is at odds with the longstanding practice of our court of appeals to strictly construe removal jurisdiction in favor of remand. That approach by our court of appeals remains the same respecting CAFA jurisdiction.  See Palisades Collections LLC v. Shorts, 552 F.3d 327, 336 n. 5 (4th Cir. 2008).  Citing similar decisions from three other circuits, the Fourth Circuit concluded that CAFA jurisdiction should be ascertained in accordance with the duty to construe removal jurisdiction strictly and resolve all doubts in favor of remand.  Id. (citing Miedema v. Maytag Corp., 450 F.3d 1322, 1328-29 (11th Cir. 2006); Abrego Abrego v. Dow Chem. Co., 443 F.3d 676, 685 (9th Cir. 2006); Pritchett v. Office Depot, Inc., 420 F.3d 1090, 1097 n. 7 (10th Cir. 2005)).

Similar to the situation in In re Edmond, the Attorney General acts in service of the state's quasi-sovereign interest in ensuring consumer protection.  He is not a class representative but does represent the interests of the state. The Attorney General does not seek treble damages for

--------------------------------------------------------

[8](...continued)
for individual enforcement, the majority opinion also distinguished two cases, noting that the statutes at issue in those cases, much like section 46A-7-111, "specifically contemplate[d] state attorneys general bringing representative actions such as the one at issue here."  Id. at 430 n.10.

policyholders as in <u>Caldwell</u> nor does he seek a duplicative recovery as in <u>Hawaii</u>.  Rather, he seeks disgorgement, injunctive relief and civil penalties reserved to the State for repeated and willful violations.  This is a classic <u>parens</u> <u>patriae</u> action that is neither a class action nor a mass action contemplated by CAFA. Consequently, removal jurisdiction under CAFA is lacking.

VII.

Based upon the foregoing discussion, the court concludes that it lacks subject matter jurisdiction.  The court, accordingly, ORDERS that the Attorney General's motion to remand be, and it hereby is, granted.  The court further ORDERS that this action be, and it hereby is, remanded for all further proceedings to the Circuit Court of Boone County.

The Clerk is directed to forward a copy of this written opinion and order to counsel of record and any unrepresented parties and a certified copy to the clerk of court for the Circuit Court of Boone County.

DATED: September 21, 2010

John T. Copenhaver, Jr.
United States District Judge